1

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,   .   Case No. 1:14-CR-00151
                            .   (RMC)
            Plaintiff,      .
                            .   Washington, D.C.
    v.                      .   June 26, 2014
                            .
JEFFREY HENRY WILLIAMSON,    .
                            .
            Defendant.      .
. . . . . . . . . . . . . .  .

**FILED**

**OCT 2 4 2014**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

PRELIMINARY HEARING/DETENTION HEARING
BEFORE THE HONORABLE JOHN M. FACCIOLA
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:        U.S. Attorney's Office
                          By:  FREDERICK W. YETTE, AUSA
                          555 Fourth Street, N.W.
                          Washington, DC 20530

For the Defendant:        Federal Public Defender
                          By:  TONY W. MILES, ESQ.
                          625 Indiana Avenue, N.W.
                          Suite 550
                          Washington, DC 20004

1          (Proceedings commenced at 1:57 p.m.)

2               THE CLERK:  Okay.  This is Criminal Case Year

3   2014-1 -- I'm sorry, (inaudible).

4               Frederick Yette for the Government.

5               Tony Miles for the Defendant.

6               This is a preliminary hearing and a detention

7   hearing.

8               THE COURT:  You may proceed, sir.

9               MR. YETTE:  Thank you, Your Honor.  Good

10  afternoon.

11              I just want to make clear for the record,

12  since I wasn't here Monday when I think Mr. Williamson

13  appeared, the Government is moving for detention under

14  18 U.S. Code 3142(f)(1)(A) and (f)(2)(A), risk of

15  flight; and also 3142(f)(1)(D), which means that he's

16  been charged with a felony and has been convicted of

17  two or more offenses that are described in the statute.

18              And with that, Your Honor, we would call our

19  witness, Adewale Mustapha.

20        ADEWALE MUSTAPHA, PLAINTIFF'S WITNESS, SWORN

21                     DIRECT EXAMINATION

22  BY MR. YETTE:

23  Q.   Good afternoon, sir.

24       Will you tell the Court your name, and spell both

25  of your names?

1    A.    My name is Adewale Mustapha, spelled A-D-E-W-A-L-E

2    M-U-S-T-A-P-H-A.

3    Q.    Where do you work, sir?

4    A.    I'm a deputy United States marshal for the

5    District of Columbia, and I'm currently assigned to the

6    FBI Violent Crime Task Force.

7    Q.    How long have you been a deputy U.S. marshal?

8    A.    Four years.

9    Q.    How long have you been assigned to the FBI Task

10   Force?

11   A.    Since October, last year.

12   Q.    And in connection with your job, did you have an

13   occasion to investigate a man named "Jeff" or "Jeffrey

14   Williamson"?

15   A.    Yes, sir.

16   Q.    Do you see Mr. Williamson in court today?

17   A.    Yes, sir.

18   Q.    Where is he?

19   A.    Sitting at the defense table in the orange

20   jumpsuit.

21        MR. YETTE:    May the record to reflect the

22   identification of Mr. Williamson?

23        THE COURT:    It will.  So ordered.

24        MR. YETTE:    Thank you.

25   BY MR. YETTE:

1   Q.   During your investigation, Deputy Marshal, did you

2   have prepared, an Affidavit and Complaint for the

3   arrest of Mr. Williamson?

4   A.   Yes, sir.

5           MR. YETTE:   Your Honor, may I approach?

6           THE COURT:   Certainly.

7   BY MR. YETTE:

8   Q.   I'm going to show you what's been marked as

9   Government's Exhibit 1.

10       Do you recognize this as the Complaint and Arrest

11  Warrant Affidavit for Mr. Williamson?

12  A.   Yes, I do.

13  Q.   And do you see your signature on those -- on the

14  Complaint and on the Affidavit?

15  A.   Yes, sir.

16  Q.   Is this a fair and accurate copy of the original

17  Complaint and Affidavit?

18  A.   Yes, sir.

19  Q.   And if the Court would allow you to adopt this as

20  part of your sworn testimony today, would you do that?

21  A.   Yes, sir.

22          MR. YETTE:   Your Honor, at this time we'd

23  move for admission of Government Exhibit 1 as --

24          THE COURT:   Hearing no objection, it will be

25  admitted.

1  BY MR. YETTE:

2  Q.   Now, did you have any corrections or anything to

3  make to this Affidavit?

4  A.   No, sir.

5  Q.   Now, Deputy Mustapha, how did Mr. Williamson first

6  come to your attention?

7  A.   I was notified by my supervisor that

8  (unintelligible) phone calls were left in Chief Judge

9  Roberts' chambers.

10  Q.   And who is Chief Judge Roberts?  And why don't you

11  move that mic towards you.

12  A.   He's the Chief Judge for District Court for the

13  District of Columbia.

14  Q.   Do you know the date that you first received that

15  notice?

16  A.   On June 8th.

17  Q.   Of this year?

18  A.   Yes, sir.

19  Q.   And after -- Well, did you listen to any of the

20  messages?

21  A.   Yes.

22  Q.   What kind of messages were they?

23  A.   It was profanity and language about how the

24  Government was trying to entrap him, and he's gonna

25  butt fuck the President and how he's going to

```
 1   (unintelligible) in a secret location in D.C.
 2   Q.   And those were messages left for Chief Judge
 3   Roberts?
 4   A.   Yes, sir.
 5   Q.   On his chambers phone?
 6   A.   Yes, sir.
 7   Q.   Now, did you receive notification that Mr.
 8   Williamson had left voice mail messages on the phone of
 9   an assistant U.S. attorney for the District of
10   Columbia?
11   A.   Yes, sir.
12   Q.   When did you get notice that those phone messages
13   had been left?
14   A.   Sorry, I don't know the exact date, but
15   (unintelligible) June 7th -- Let's see, no July -- No,
16   June 10th, 2014.
17   Q.   That's when you received notice?
18   A.   Yes.
19   Q.   Do you remember the date the messages were
20   actually left on the phone?
21   A.   No, June (phonetic) 8, 2014.
22   Q.   Did you listen to those voice mail messages?
23   A.   Yes, sir.
24   Q.   What was the general context or the general
25   content of those messages?
```

1    A.    Basically (unintelligible) back and then

2    (unintelligible) Brian Schmitt, said he's gonna butt

3    fuck the President, Attorney General (unintelligible)

4    and profanity (unintelligible) and he got progressively

5    worse.

6    Q.    Okay.

7          And who is FBI Agent Schmitt?

8    A.    He's a (unintelligible) in Colorado that

9    investigated the case in Colorado.

10   Q.    Against Mr. Williamson?

11   A.    Against Mr. Williams, yes.

12   Q.    And when was investigation?  What year; do you

13   recall?

14   A.    In 2008.

15   Q.    Do you recall in your Affidavit -- Let me show you

16   paragraph 5.

17   A.    Yes.

18   Q.    Was the year 2008 or a different year?

19   A.    2005.

20   Q.    Now, after you got notification of the voice mail

21   messages on AUSA's phone, did FBI agents go and talk to

22   Mr. Williamson?

23   A.    Yes, sir.

24   Q.    Describe how that happened.

25   A.    Got notification that Mr. Williamson was around 16

1    and H, Lafayette Park, by the White House, so

2    (unintelligible) contacted my supervisor and, in turn,

3    had my colleague, Special Agent Chad Fleming (phonetic)

4    Justin Hogate (phonetic) go interview Mr. Williamson.

5    Q.   Did they tell you what happened during that

6    interview?

7    A.   Yes, sir.

8    Q.   `All right.

9         Specifically, did Special Agent Fleming tell you

10   what happened?

11   A.   Yes, sir.

12   Q.   What did he tell you about the interview with Mr.

13   Williamson?

14   A.   Told me they addressed -- they identified

15   themselves, and he told about that -- the phone calls

16   being received.

17        Mr. Williamson stated he's made a lot of all calls

18   in the past few days to different agencies because the

19   FBI is trying to harass him and trap him, and he was

20   advised not to make anymore further calls.  He was

21   admonished and he stated he wouldn't hurt anybody, he

22   just want FBI Agent Brian Schmitt to stop harassing

23   him.

24   Q.   What was Mr. Williamson's demeanor like during

25   this encounter?

1   A.   Said he was cranky (phonetic).

2   Q.   And did Agent Fleming or Colgate leave a number

3   with Mr. Williamson?

4   A.   Yes.

5   Q.   What number was that?

6   A.   CTOC number (unintelligible) FBI Washington Field

7   Office.

8   Q.   Why did the give him that number?

9   A.   Because he got a other information he wanted to

10  share, if he wanted to talk further.

11  Q.   What did Agent Fleming tell him about calling

12  Chief Judge Roberts?

13  A.   It's not gonna achieve anything, to stop calling.

14  Q.   And how Mr. Williamson responded to that?

15  A.   From what I understand he was (unintelligible).

16  He said he'll stop calling -- He said he'll stop

17  calling (unintelligible).

18  Q.   Later that same evening of the interview, did the

19  FBI receive a call from Mr. Williamson?

20  A.   Yes, a call received to CTOC, the number that was

21  left with Mr. Williamson, and stated he forgot to give

22  the -- Chad -- the Special Agent Chad Fleming his

23  websites, and I was notified of that call, as well as

24  another call that was left with Chief Judge Roberts.

25  Mr. Williamson stated he was being harassed by FBI

1  agents again.

2  Q.  Hold on a second.

3     So first Mr. Williamson spoke to the FBI at CTOC?

4  A.  CTOC, yes.

5  Q.  Give us those initials for the record.

6  A.  It's (unintelligible) the command center.

7  Q.  Okay, is that "CTOC"?

8  A.  CTOC, yes.

9  Q.  Then later that same day, after the agent spoke to

10  Mr. Williamson at Lafayette Park, did Mr. Williamson

11  call Chief Judge Roberts' chambers?

12  A.  Yes, sir.

13  Q.  Do you know about what time he called the

14  chambers?

15  A.  I'd say approximately 8:00 p.m.

16  Q.  And how do you know that?

17  A.  I was notified.

18  Q.  Who notified you?

19  A.  An employee from Chief Judge Roberts' chambers.

20  Q.  When did you get that notice?

21  A.  The next day, which would be June 13, that Friday.

22  Q.  Did you actually talk to the member of Chief Judge

23  Roberts' chambers?

24  A.  Yes, sir.

25  Q.  What did that person tell you happened?

1   A.   He received a phone call (unintelligible) Jeffrey

2   Williamson stated is named, talked about this web

3   sites, and talked about agents harassing him again.

4   he's gonna keep calling Chief Judge Roberts' chambers

5   until he puts a stop to this harassment.

6   Q.   Who did Mr. Williamson say was harassing him?

7   A.   FBI special agents orchestrated by Brian Schmitt.

8   Q.   Now, on June 19th did you did notice of another

9   phone call by Mr. Williamson?

10  A.   Yes, sir.

11  Q.   Tell us about that phone call?

12  A.   We were notified -- My supervisor and myself

13  notified by CTOC, C-T-O-C, about a call that came in

14  from an MPD 911 operator, Officer Serpas, of an

15  individual that called in.

16  Q.   Okay.  You said Officer Serpas?

17  A.   Serpas.

18  Q.   Could you spell that?

19  A.   S-E-R-P-A-S.

20  Q.   Okay.

21       Did you listen to that 911 call?

22  A.   Yes, sir.

23  Q.   Deputy Mustapha, I'm showing you Government

24  Exhibit 2.

25       Do you recognize what this is?

1  A.    Yes, sir.

2  Q.    What is it?

3  A.    It's a CD of the recording of that first message.

4  Q.    And you initialed this?

5  A.    Yes, sir.

6  Q.    What are your initials?

7  A.    A.M.

8  Q.    And you dated it?

9  A.    "6/26/2014."

10 Q.    Okay.

11       And is this a fair and accurate recording of the

12 911 call by Mr. Williamson?

13 A.    Yes, sir.

14       MR. YETTE:   Your Honor, I'd like to play the

15 call.

16       THE COURT:   Please do, sir.

17       MR. YETTE:   And, Your Honor, it's actually a

18 little bit easier if I use -- it's already on here,

19 it's on my computer, but it is --

20 BY MR. YETTE:

21 Q.    You listened to both versions, the one on my

22 computer laptop as well as the CD?

23 A.    Yes, sir.

24 Q.    And are they the same?

25 A.    Yes, sir.

1           (An audio recording is played.)

2           (The audio recording stops.)

3           (The audio recording resumes.)

4           (The audio recording concludes.)

5    BY MR. YETTE:

6    Q.   Okay.

7         Now, Mr. Mustapha, there were a couple of websites

8    that Mr. -- Well actually, let me ask this first.

9         Did you recognize the voice in that recording?

10   A.   Yes, sir.

11   Q.   Who did that voice belong to?

12   A.   Jeffrey Williamson.

13   Q.   And did the Metropolitan Police Department do

14   anything to help identify who the caller was?

15   A.   Yes, sir.

16   Q.   What did they do?

17   A.   The number was traced back to one Jeffrey

18   Williamson, and it was identified as hitting off the

19   1700 Pennsylvania cell towers, and then it goes -- that

20   informational goes to 1041 Wisconsin Avenue, Northwest.

21   Q.   And who was the name of the subscriber?

22   A.   Jeffrey Williamson.

23   Q.   Okay.

24        Now, let me ask you, did you actually look at the

25   websites that Mr. Williamson mentioned during that

1   phone call?

2   A.   Yeah, I glanced.

3   Q.   Was his name connected to either or both of those

4   websites?

5   A.   Yes, sir.

6   Q.   Now, after that phone call, did you seek an arrest

7   warrant for Mr. Williamson?

8   A.   Yes, sir.

9   Q.   And was it obtained?

10  A.   Yes, sir.

11  Q.   On what day?

12  A.   It's a Friday.

13  A.   June 20th?

14  A.   June 20th, yeah.

15  Q.   Did you help participate in searching for Mr.

16  Williamson to place him under arrest?

17  A.   Yes, sir.

18  Q.   Tell us where you went and what you did.

19  A.   We proceeded to 1041 Wisconsin Avenue, my squad --

20  myself and my squad members.

21  Q.   What part of town is that in?

22  A.   Northwest.

23  Q.   And what's located at that address?

24  A.   Campus Ministry -- Georgetown Ministry Shelter or

25  transitional.

1    Q.    Okay.

2          Is it a permanent residence for anyone?

3    A.    I believe so.

4    Q.    Did you find Mr. Williamson at that location?

5    A.    No.

6    Q.    Had he been there that day?

7    A.    We were told he just left 20 minutes prior we got

8    there.

9    Q.    And did you continue looking?

10   A.    Yeah.  We canvassed the area to see if we would

11   locate him (unintelligible).

12   Q.    Did you find out where he was?

13   A.    Yes.  He was located by my other colleagues at 16

14   and H, Northwest, by Lafayette Park.

15   Q.    Did you go to that location?

16   A.    Yes, sir.

17   Q.    When you arrived at the location, do you remember

18   about what time it was?

19   A.    I don't remember.

20   Q.    Okay.

21         What did you see when you arrived?

22   A.    I saw Mr. Williamson in handcuffs sitting down.

23   Q.    Did you approach him?

24   A.    Yes, I approached him with my colleague, Special

25   Agent Jim Christie (phonetic) and Special Agent Dunham

1  -- John Dunham.

2  Q.   Dunham?

3  A.   Yes.

4  Q.   Is that D-U-N-H-A-M?

5  A.   H-A-M, yeah.

6  Q.   What did you guys do?

7  A.   Myself and Special Agent Jim Christie proceeded

8  from over there.  Jim Christie was going to go pat Mr.

9  Williamson down to the transporter by MPD, so was in

10  the process of patting Mr. Williamson --

11  Q.   Was Mr. Williamson seated or standing at this

12  time?

13  A.   At that time we stood him up.

14  Q.   Okay.  And describe the pat down.

15       What happened?

16  A.   We want to pat him down before you transport and

17  make sure (unintelligible) searches to make sure he

18  doesn't have a weapon on him (unintelligible) with

19  them.  He had three bags with him, and Special Agent

20  John Dunham ask him (unintelligible) for his luggage

21  and he stated (unintelligible) "Fuck the FBI" and

22  (unintelligible), and Special Agent Christie proceeded

23  to pat him down, and Mr. Williamson stated, "Why don't

24  you take off your cuffs and I'll gouge out your eyes

25  and cut out your trachea (unintelligible) like

1    pussies."

2            THE DEFENDANT:  That's a lie.

3            UNIDENTIFIED SPEAKER:  (Inaudible.)

4    BY MR. YETTE:

5    Q.   Did you hear that?

6    A.   Yes, sir.

7    Q.   How close was Agent Christie to Mr. Williamson

8    when that was happening?

9    A.   Very close, in his close proximity.

10   Q.   Was he going to engage in the pat down when that

11   was made, or --

12   A.   Yes.

13   Q.   How close were you when that was happening?

14   A.   I was right next to Special Agent Christie.

15   Q.   What was Mr. Williamson's demeanor or attitude

16   like when he made the statement?

17   A.   He was agitated, just physically agitated and

18   (unintelligible).

19   Q.   Did you -- What did you think was --

20   A.   I thought --

21           UNIDENTIFIED SPEAKER:  (Inaudible.)

22   A.   (Continuing.)  I thought he was going to hit or

23   spit in front of Special Jim Christie's face because

24   they were in very close proximity.

25   BY MR. YETTE:

1   Q.   Now, did you obtain Mr. Williamson's
2   identification?
3   A.   Yes, sir.
4   Q.   What kind of ID was it?
5   A.   It's a Texas ID.
6   Q.   And do you remember when it was issued?
7   A.   No.
8   Q.   To your knowledge, does Mr. Williamson have a
9   permanent residence in the District of Columbia?
10   A.   No.
11   Q.   Do you remember what he's told agents when he came
12   to this area, the D.C. area?
13   A.   Told Special Agent Fleming that he's been in D.C.
14   for the past few months and stays with friends.
15   Q.   Does he have a permanent home here?
16   A.   No.
17   Q.   Do you know has -- whether he has traveled to
18   other states --
19   A.   Yes.
20   Q.   -- during the last few years?
21   A.   Yes.
22   Q.   What states has he been in?
23   A.   He's been in Nevada.  He's been in, what is it,
24   Denver, Texas.
25   Q.   Colorado?

1   A.   Yeah, Denver, Colorado.  He had Texas, to my

2   knowledge.

3          MR. YETTE:  I don't have any further

4   questions, Your Honor.

5          THE COURT:  Cross-examine?

6               CROSS-EXAMINATION

7   BY MR. MILES:

8   Q.   Good afternoon.

9   A.   Good afternoon.

10   Q.   I want to began by asking you questions about any

11   police reports or notes that you made in connection

12   with the matters about which you testified today.

13   A.   Yeah.

14   Q.   Can you -- Have you made any reports?

15   A.   Any?

16   Q.   Have you made any police reports or other types of

17   reports relating to the matters about which you've

18   testified?

19   A.   I don't understand your question.

20   Q.   Have you written a police report --

21   A.   I don't (unintelligible) writing a police report.

22   I'm not -- I'm (unintelligible) EC.

23   Q.   What's an "EC"?

24   A.   EC is a paperwork to look at my case against an

25   individual.

1    Q.   Okay.

2         And in that EC did you describe certain facts and

3    notes related to the matters that you discussed here

4    today?

5    A.   Yes, I described how or when I was notified of the

6    (unintelligible).

7    Q.   Okay.

8         Was the EC a -- an FBI document?

9    A.   Yes, sir.

10   Q.   Okay.

11        MR. MILES:  Your Honor, if I can confer with

12   Government counsel for a moment?  And let me -- I'm

13   sorry, just let me ask one --

14   BY MR. MILES:

15   Q.   How many?  Is it just one EC, or are there more

16   than one?

17   A.   There's an original EC and there's subsequent

18   ECs, --

19   Q.   Okay.

20   A.   -- subsequent 302s, yeah.

21   Q.   So -- Well, how many reports or documents did you

22   write?

23   A.   I wrote a couple.  I wrote the (unintelligible) EC

24   (unintelligible) when I was notified by CTOC about the

25   calls and the additional call to Chief Judge Roberts.

1    Q.   Well, let me ask -- What I'm trying -- I'm trying

2    to get a precise number.

3         Do you know exactly how many reports you wrote?

4    A.   I don't know precise how many reports I've

5    written.

6    Q.   In connection with this case?

7    A.   No.

8    Q.   Was it more than three?

9    A.   Probably.

10   Q.   Probably more than three?  Did you do any

11   handwritten notes in addition to these reports?

12   A.   (Unintelligible.)

13   Q.   No?

14             MR. MILES:  Your Honor, if I could confer

15   with Government Counsel for a moment?

16        (Mr. Miles and Mr. Yette confer.)

17             MR. MILES:  Your Honor, may I approach?

18             THE COURT:  To who?

19             MR. MILES:  To the witness.

20             THE COURT:  Oh, sure.

21   BY MR. MILES:

22   Q.   What I'm showing you are the materials the

23   Government produced to me in compliance with the Jencks

24   obligations.

25        Can you look through that to determine whether

1   that -- those consist of all the reports you made?  I

2   think there's one report that's not related to you, but

3   I just want to make sure I have everything.

4         (Pause.)

5   Q.  (Continuing.)  Does this consist of all the

6   reports you prepared?

7   A.  Yes, sir.

8   Q.  All right.  Thank you.

9       Now, you stated in your Affidavit attached to the

10   Complaint, that Mr. Williamson arrived in the District

11   of Columbia on May 27, 2014.

12       Is that your understanding?

13   A.  Yes, sir.

14   Q.  And what do you base that on?

15   A.  I talked -- Government (phonetic) Counsel.

16   Q.  I'm asking you if you -- Do you know what -- What

17   do you base that on?

18   A.  Yeah, based on an assessment that was made.

19   Q.  Why do you believe he came here on May 27th?

20   A.  Our assessment was made by the General Terrorism

21   Task Force on Mr. Williamson.  That was the

22   information.

23   Q.  Okay.

24       Did -- Through this assessment, did you have

25   reason to believe that he came here on May 27th?

```
 1    A.   Around (unintelligible).
 2    Q.   Well, what about the assessment leads you to
 3    believe --
 4              MR. YETTE:  Objection; discovery.
 5              THE COURT:  I don't understand that.  There's
 6    an assessment done by someone?
 7              THE WITNESS:  Yes.
 8              THE COURT:  And that (unintelligible) places
 9    of Mr. Williamson in the District of Columbia on a
10    given day?
11              THE WITNESS:  Yes, sir.
12              THE COURT:  Do you know how that assessment
13    was arrived?
14              THE WITNESS:  I don't know if I can get into
15    it.
16              MR. YETTE:  Your Honor, --
17              THE COURT:  All right.  With respect to
18    (unintelligible) the nature of your objection.
19              Mr. Miles has asked the question is how does
20    he know that he got here at -- on a given date, and the
21    answer is, "There was an assessment."
22              UNIDENTIFIED SPEAKER:  Yes.
23              THE COURT:  And any objection to anything
24    more than that is?
25              MR. YETTE:  It's discovery and it's
```

1    unnecessary to the issues.

2            THE COURT:  Sustained.

3    BY MR. MILES:

4    Q.   Now, you testified that you believe he was living

5    at a shelter on Wisconsin Avenue.

6            Is that my understanding?

7    A.   I believe, yeah, he resides there.

8    Q.   And what was the address?

9    A.   1041 Wisconsin Avenue.

10   Q.   And why do you believe he was staying there?

11   A.   On his notification from the phone call, MPD

12   traced subscriber information, comes back to 1041

13   Wisconsin (unintelligible) authorized and is a

14   transition place, we believe it.  Yeah.

15   Q.   So was it -- It's based solely on the subscriber

16   information you received in connection with one of the

17   telephone numbers related to one of the telephone

18   calls, and that information indicated the subscriber

19   provided an address of 1041 Wisconsin Avenue?

20   A.   Yes.

21   Q.   Is there any other reason you believe -- any other

22   information you have to indicate that he lived at that

23   residence, other than that?

24   A.   Yes.

25   Q.   Can you explain?

1    A.    His probation officer from Texas was able to track

2    Mr. Williamson down and that was the location that was

3    given.

4    Q.    So you -- So a probation officer from Texas said

5    that Mr. --

6    A.    Yeah, if I'm not mistake.  Yeah, I believe, if I'm

7    not mistaken.

8    Q.    So a probation officer from Texas was obviously

9    contacted, correct?

10   A.    Yes.

11   Q.    And his probation officer was asked information

12   about Mr. Williamson's whereabouts?

13   A.    Yes.

14   Q.    And when --

15            THE DEFENDANT:  Excuse me.  I don't have a

16   probation officer.  I'm not on probation.

17            THE COURT:  Mr. Williamson, please be quiet

18   while your lawyer is interrogating.  Go ahead.

19   BY MR. MILES:

20   Q.    What --

21   A.    I'm going to correct that with a (unintelligible)

22   individual that used to supervise Mr. Williamson.

23   Q.    Yes.

24        Some we're clear, he is a former probation

25   officer, right?

1  A.   I believe so.

2  Q.   And that person -- And you tried to get

3  information from that person about Mr. Williamson's

4  location, correct?

5  A.   This was done through the assessment.

6  Q.   Well, what -- What were you told by the probation

7  officer about --

8  A.   I didn't speak to the probation officer

9  (unintelligible).

10  Q.   What do you understand law enforcement was told by

11  the probation officer?

12  A.   From what I understand, Mr. Williamson was -- when

13  he was in Texas he was making phone calls to Denver, as

14  well, and from a probation officer, from my

15  understanding, stated Mr. Williamson is in Washington,

16  D.C. area, and he is residing or lives at Georgetown

17  Ministry at 1041 Wisconsin Avenue.

18  Q.   So it's your understanding that the probation

19  officer gave you that address of 1041 Wisconsin --

20  A.   Not to me personally, it was through the

21  assessment.

22  Q.   Just a second.

23       The probation officer gave someone in law

24  enforcement --

25  A.   (Unintelligible), yes.

1  Q.   -- the address of 1041 Wisconsin Avenue in

2  connection with Mr. Williamson?

3  A.   Yes, sir.

4  Q.   And gave the name of Georgetown Ministries as the

5  place where he was living?

6  A.   Yes, sir.

7  Q.   All right.

8       Do you have information regarding how frequently

9  you believe Mr. Williamson was staying at that

10 location?

11          MR. YETTE:  Objection as to relevance.

12          THE COURT:  No, it bears on his roots to the

13 community.

14          All you knew, he was at this shelter?

15          THE WITNESS:  I knew he was at the shelter,

16 but from my colleagues telling me, and Mr. Williamson

17 stated he was with friends, so we believe he was

18 transient.

19 BY MR. MILES:

20 Q.   Well, do you have information from the shelter or

21 from any other sources as to how frequently he stayed

22 in that shelter?

23 A.   No.

24 Q.   Or when he began staying at the shelter?

25 A.   No.

1   Q.   But do you have information, other than from the

2   probation officer, that Mr. Williamson, in fact, stayed

3   at that shelter?

4   A.   No.

5   Q.   Well, did you learn something from the shelter --

6   the people at the shelter?

7   A.   We were looking for Mr. Williamson so we did not

8   conduct an interview.  After we were told Mr.

9   Williamson had just left 20 minutes prior to we getting

10  there, we started canvassing that area, so we did

11  not --

12  Q.   And that's also -- You indicated on the record you

13  went to the shelter to look for Mr. Williamson, and

14  somebody at the shelter told you he just left?

15  A.   Yes, sir.

16  Q.   Did they say anything as to whether he stayed

17  there or how long he was there prior to leaving?

18  A.   No.

19  Q.   So all they told you is he left?

20  A.   Yes.

21  Q.   And they didn't indicate to you, whether he had

22  stayed there?

23  A.   I didn't ask.

24  Q.   Okay.

25       But you were not told that, correct?

1  A.  No, I was not told.

2  Q.  Now, you testified about some websites that you

3  believe are attributed to Mr. Williamson?

4  A.  Yes, sir

5  Q.  And you looked at these websites; is that correct?

6  A.  Yes, sir.

7  Q.  On the websites, are there any statements on there

8  that you would classify as threatening?

9  A.  It's not personal knowledge, it's propaganda,

10  impeach Obama, Attorney General, CIA, contract

11  civilians that was employed back in and '80s being

12  utilized on American citizens now.

13  Q.  In other words, it's political speech, right?

14         THE COURT:  I don't think it's fair to ask

15  him to characterize it.  He's discussed it.  Whether

16  others would characterize it as political speech is of

17  no moment.

18  BY MR. MILES:

19  Q.  Now, you testified about a variety of phone calls

20  on direct.

21  A.  Yes, sir.

22  Q.  One of them was a threat, I think -- well, a

23  statement regarding -- that you testified, butt fucking

24  the President or the Attorney General.

25         Where was that -- Was this a message?

1    A.   It was one of the messages that was left on the
2    United States Attorney's phone message.
3    Q.   Okay.  An assistant U.S. attorney or the United
4    States Attorney?
5    A.   Assistant United States attorneys.
6    Q.   And that was left on a -- was it a assistant
7    United States attorney in Washington, D.C. or
8    elsewhere?
9    A.   Here, sir.
10   Q.   And this is a voice message left on that person's
11   own --
12   A.   Yes, sir.
13   Q.   -- phone?
14        And did you listen to the message?
15   A.   Yes, sir.
16   Q.   And can you, as best you can recall, describe what
17   was stated in that message?
18   A.   It was 14 phone calls, 14 voice messages, went on
19   talking about his websites, profanity laced out
20   (phonetic), he's being trapped by the Government, he's
21   going to butt fuck the President, Attorney General
22   Holder is a pet monkey, and then he stated that United
23   States should do something about it and he started
24   using the "B" word -- started using the "B" word on the
25   phone.  He got progressively worse, threatening

1   language, a lot of  profanity.

2   Q.   And when you said he said he was going to butt

3   fuck the President, that was -- he stated -- that was

4   by -- Court's indulgence.

5        That was by prevailing in litigation against the

6   Government, correct?

7   A.   Excuse me?

8   Q.   In other words, the statement about that he was

9   going to butt fuck the President, the sentence ended

10  with he was going to do that by prevailing in

11  litigation against the Government, correct?

12  A.   I guess that's the way you're assessing it.

13  Q.   Well, I'm not -- that -- I mean, I'm asking you if

14  that's what you recall when you listened to the --

15  A.   You asked me and I told you I recalled the

16  messages, what he was -- I was listening to the

17  messages, and that's what I heard from listening to the

18  messages, profanity laced, and "I was being entrapped,

19  and I was" -- had a little more context, but I'm just

20  telling you what he said.

21  Q.   And your recollection today, as you testified, you

22  don't recall him connecting the comment about --

23  A.   I recollect that statement, saying he was going to

24  butt fuck the President and Attorney General, and he's

25  calling the AUSA, "You're not doing anything about it,

1  I'm still being gang stalked," and "I'm still being

2  harassed.  The Government is trying to entrap me," and

3  he talks about his websites.  It was 14 phone calls.

4  Q.  What the question is, is I'm trying to ask you,

5  what do you recall, because you talked about the

6  significance of this alleged statement about he's going

7  to butt fuck the President, and what I'm asking you is

8  whether, within that same sentence, he explained what

9  he meant by that, and it was by prevailing in

10 litigation against the Government?  Do you recall that

11 as part of that statement, --

12 A.  I think I'm not.

13 Q.  -- or do you not recall that?

14 A.  No.

15 Q.  All right.  Fair enough.

16     And when the caller said "the President," did the

17 caller identified who he meant by "the President"?

18 A.  The person -- One of the calls said -- he

19 mentioned that, "That MF in the White House."

20 Q.  So he said, "the White House"?

21 A.  And he mentioned Obama.

22 Q.  He mentioned -- By name?

23 A.  Yes, in one of the calls.  That's what I'm saying,

24 it was 14 calls, and he got progressively worse --

25 Q.  So --

1    A.   -- so it was (unintelligible).

2    Q.   Okay.

3         In one of the 14 calls he mentioned, "the White

4    House," correct?

5    A.   And several times he mentioned the President and

6    the Attorney General.

7    Q.   Well, just -- The specific question is in one of

8    those 14 calls he mentioned "the White House," --

9    A.   Yes.

10   Q.   -- or in more than one?

11   A.   More than one, yes.

12   Q.   He mentioned, "the White House"?

13   A.   He mentioned, "the White House."

14   Q.   And you're saying in at least one of the calls he

15   mentioned Obama by name?

16   A.   Yes.

17   Q.   Okay.

18        But was the White House or Obama mentioned in the

19   same call where he talked about --

20   A.   I don't remember specifically, but I know it was

21   14 calls, and I don't remember which specific one he

22   mentioned the President, and the White House and

23   (unintelligible) I didn't (inaudible).

24   Q.   Was the Attorney General mentioned in any of those

25   14 calls?

1   A.    Yes.

2   Q.    And did the caller identify to whom he was

3   referring when he was --

4   A.    Yeah, he said -- I --

5   Q.    -- referencing the attorney general?

6   A.    Yeah, he quoted the attorney general's name, one

7   the calls.

8   Q.    What did he say?

9   A.    "Eric Holder."

10  Q.    And he mentioned that in one of the calls?

11  A.    In one of the calls, yes.

12          THE DEFENDANT:   Your Honor, may I address the

13  Court?

14          THE COURT:   You have counsel.

15          Mr. Miles, why don't you confer with Mr.

16  Williamson.

17          MR. MILES:   Sure.

18      (Mr. Miles and the Defendant confer.)

19  BY MR. MILES:

20  Q.    Now, you testified on direct that you believe

21  these calls that we were just talking about, the 14 to

22  the assistant United States attorney, who do you

23  believe made those phone calls?

24  A.    Jeffrey Williamson.

25  Q.    And why do you believe he made those phone calls?

1  A.   He stated his named before he started -- Almost

2  all of the calls, he stated his name and he stated his

3  websites.

4  Q.   Do you have any other reason to believe he made

5  those calls, other than that his -- the caller stated

6  the name of "Jeffrey Williamson"?

7  A.   That's similar -- It's the same way he starts his

8  phone calls and the same way he names himself on the

9  other calls that I listened to from Chief Judge

10  Roberts.

11  Q.   Do you have subscriber information regarding the

12  telephone number --

13         MR. YETTE:   Objection (unintelligible).

14         THE COURT:   Please say it again.

15         MR. MILES:   I'm asking if he has subscriber

16  information regarding the source of that phone call.

17         THE COURT:   Objection is sustained.

18  BY MR. MILES:

19  Q.   You also testified about what I understand to be

20  phone calls.   I don't know if they're messages or --

21  A.   Phone messages.

22  Q.   Well, I'm talking about another set now, --

23  A.   Okay.

24  Q.   -- to Chief Judge Roberts here in the United

25  States District Court in Washington, D.C.?

1    A.    Yes, sir.

2    Q.    Were those all messages, as well?

3    A.    Yes, sir.

4    Q.    All right.  And --

5    A.    Except the one that was made on -- after he was

6    interviewed.  That was not a message.  An individual

7    actually picked up.

8    Q.    So there was one where he actually spoke to

9    somebody?

10   A.    Yes, sir.

11   Q.    How many messages were left that you --

12   A.    Four.

13   Q.    -- believe were left by Mr. Williamson?

14   A.    For who?  Chief Judge --

15   Q.    For Chief Judge Roberts?

16   A.    Six messages.

17   Q.    Six messages, and then one call where someone

18   actually spoke to him?

19   A.    Yes, sir.

20   Q.    So in that -- You testified on direct about -- I

21   don't know if he said a bomb or a smoke bomb at a

22   secret location.

23        Was it a smoke bomb?

24   A.    Mr. Williamson stated on the last call -- one of

25   the calls to Chief Judge Roberts, that he was going to

1    -- mentioned smoke bomb or a smoke bomb in a secret
2    location in D.C.
3    Q.   Did he say -- He said no other information about
4    the location?
5    A.   No.  He said, "a secret location."
6    Q.   No information about who was being targeted --
7    A.   No.
8    Q.   -- in connection with the smoke bomb?
9    A.   No.
10   Q.   Now, you -- Similar question I asked with respect
11   last series of phone messages.
12        Who do you believe made these phone calls, or left
13   these messages for Chief Judge Roberts?
14   A.   Mr. Williamson.
15   Q.   And why do you believe it was Mr. Williamson?
16   A.   He stated his name and stated his websites.
17   Q.   Any other reason to believe Mr. Williamson made
18   those calls, other than what you just testified?
19   A.   (Inaudible.)
20   Q.   You have to say --
21   A.   I don't know, and really, I believe because he
22   stated his name and he stated the websites.  That's
23   been Mr. Williamson's way of leaving messages.
24   Q.   And the question is, is do you have any other
25   reason to believe that he left those messages, other

1   than what you just said, that he stated his name and

2   websites?

3   A.    I don't understand the question (unintelligible).

4   Q.    If you -- The question is, is you gave me two

5   reasons to believe Mr. --

6           MR. YETTE:  Objection (inaudible) reasons to

7   (inaudible) objectionable (inaudible).

8           MR. MILES:  Your Honor, I -- it's relevant to

9   this streak of their --

10          THE COURT:  Repeat your question.  Let me

11  hear it again.

12          MR. MILES:  The question is, is other than

13  the caller leaving the name Jeffrey Williamson and

14  referring to certain websites that the witness believes

15  is connected with Mr. Williamson, is there any other

16  reason for him to believe that Mr. Williamson was the

17  person who left the messages for Chief Judge --

18          THE COURT:  Well, if that was -- Are you

19  suggesting by your question, and asking of the Marshal,

20  whether he used a mechanical device to trace the phone

21  number back to a human being?

22          MR. MILES:  That --

23          THE COURT:  Is that what you want to know?

24          MR. MILES:  Well, there could be a variety of

25  reasons he could believe -- He could believe --

1        THE COURT:  That's the only one that comes to

2   mind, and that's --

3        MR. MILES:  He could --

4        THE COURT:  Well, let me see this.

5        In terms of the investigation of the calls to

6   the Chief Judge, besides listening to them, did you

7   conduct any kind of forensic investigation with

8   reference to the source of the phone calls?

9        Just answer that question "Yes" or "No."

10       THE WITNESS:  No.

11       THE COURT:  Thank you.

12  BY MR. MILES:

13  Q.   Did any witness tell you anything about who made

14  those phone calls?

15  A.   No.

16  Q.   All right.

17       Did Mr. Williamson make any statements about

18  whether he made those series of phone calls that we're

19  talking about with respect to Chief Judge Roberts?

20  A.   When he was interviewed by Special Agent Nick

21  Fleming, he stated he had made several phone calls to

22  different agencies.

23  Q.   But he didn't specify what phone calls or to what

24  agencies, did he?

25  A.   There's no specificity, but he stated he had made

1   phone calls because he was being questioned and being

2   talked to about those phone calls, and he stated yes,

3   he has made several phone calls.

4   Q.   Okay.

5        So -- But he never said he made any phone calls to

6   Chief Judge Roberts, right?

7   A.   He didn't say that, not to my knowledge.

8   Q.   He never said he made any phone calls to an

9   assistant United States attorney, correct?

10  A.   He stated he made phone calls to different

11  agencies.

12  Q.   But he never specified that it was to an assistant

13  U.S. attorney; is that correct?

14  A.   He stated he made phone calls.

15  Q.   Well, --

16            THE COURT:   I think you got your answer.

17  Please proceed.

18  BY MR. MILES:

19  Q.   And he never stated that he made any phone calls

20  to the Metropolitan Police Department --

21            THE COURT:   Asked and answered four times.

22  Move on.

23            MR. MILES:   Your Honor, this is a different

24  question.   It relates to the 911 --

25            THE COURT:   It's not a different question.

1    Asked and answered.  Move on.

2         (Pause.)

3    BY MR. MILES:

4    Q.   Now, you testified about a statement where an FBI

5    agent, Brian Schmitt, was referenced, correct?

6    A.   Yes.

7    Q.   And that was a conversation that someone had with

8    a 911 operator; is that correct?

9    A.   Yes, sir.

10   Q.   And on what date was that call made?

11   A.   June 19th.

12             THE DEFENDANT:  May I confer with counsel,

13   Your Honor?

14             THE COURT:  Sure.

15        (Mr. Miles and the Defendant confer.)

16             MR. MILES:  Court's indulgence for a moment,

17   please.

18        (Pause.)

19             MR. MILES:  Well, since we heard the tape of

20   the call ourself, and I had questions I was going to

21   ask him about the call, but I don't think I need to do

22   that since we heard it for ourselves.

23   BY MR. MILES:

24   Q.   So I will move on and ask you about your

25   information regarding why you believe Mr. Williamson

1    made these calls.  I know that -- I'm going to get to
2    (unintelligible) your subscriber information for this
3    call, but let me ask you, did -- and I don't recall
4    this in what I heard, but did the person identify
5    himself as Mr. Williamson in the call?
6    A.   Which call?
7    Q.   The 911 call.
8            THE COURT:   The call that's reproduced in
9    your Affidavit.
10   A.   No.
11   BY MR. MILES:
12   Q.   Okay.
13       In fact, the operator asked him several times,
14   "What is your name?  What is your name?", correct?
15   A.   Yes.
16   Q.   And from what I recall, the caller never answered
17   the question; is that correct?
18   A.   Yes.
19   Q.   All right.
20       Now -- So you also maintained that you have some
21   subscriber information that connects Mr. Williamson to
22   that phone call to the 911 operator; is that correct?
23   A.   There was investigative checks (phonetic) that
24   were done.
25   Q.   Well, specifically there's some subscriber

 1   information; is that correct?

 2   A.   Yeah.

 3   Q.   Can you discuss that for me, please?

 4   A.   What do you mean?

 5   Q.   You have information regarding what telephone

 6   number -- from what telephone number that call was

 7   made?

 8   A.   Law enforcement databases were checked for that

 9   number, and one of the names that came up was -- one of

10   -- the name that came up was "Jeffrey Williamson."

11   Q.   All right.  Well, let me be clear as to what you

12   said.  I just want to -- What, is Jeffrey Williamson

13   the only name that came up with the number, or was it

14   one of the names?

15   A.   The only name that came up.

16   Q.   All right.

17        Now -- So what you're indicating is that law

18   enforcement was able to determine the number from which

19   that call was made; is that correct?

20   A.   Yes.

21   Q.   And through further investigation, that telephone

22   number is connected to Mr. Williamson; is that correct?

23   A.   Yes, sir.

24   Q.   And that's what I'm trying -- How was it connected

25   to him?  In what way?

1  A.  Law enforcement database was checked and Mr.

2  Williamson names -- the name came up, with a number.

3  Q.  And what does it mean by, "his name come up"?,

4  that he's --

5  A.  His name --

6  Q.  -- the subscriber of this number or --

7  A.  His name -- Yes, subscriber.

8  Q.  And nobody else's name came up with that number?

9  A.  No.

10 Q.  All right.

11      And it had -- In addition to Mr. Williamson's

12 name, it had an address, is that my understanding,

13 connected with that -- with his name?

14 A.  The database that was checked had his name.

15 Q.  Just his name?

16 A.  Had his name, yes.

17 Q.  And there was a separate source that you got the

18 address; is that right?

19 A.  The other source was MPD.  Initially, when a 911

20 call goes into MPD 911 operator, case of emergency to

21 try to locate the cell tower that is being utilized,

22 and the subscriber information --

23 Q.  All right.

24 A.  -- from MPD.

25 Q.  What I'm trying to determine is that my

1      understanding is you were able to determine that the
2      telephone number is connected to a Mr. Williamson at
3      the 1041 Wisconsin residence, and I'm just trying to
4      find out if the subscriber --
5              THE COURT:  I think you're mischaracterizing
6      what he said.
7              As I understand what you said, and correct me
8      if I'm wrong, Deputy, you ascertained the location by
9      using cell site?
10             THE WITNESS:  MPD has that capacity when a
11     911 call comes in.
12             THE COURT:  To know where it is?
13             THE WITNESS:  To know where it is and the
14     subscriber information.
15             THE COURT:  And that, in fact, is pursuant to
16     an FCC regulation that requires it?
17             THE WITNESS:  Yes, sir.
18             THE COURT:  So therefore, you knew where the
19     phone -- from where the call was made?
20             THE WITNESS:  Yes, sir.
21             THE COURT:  All right.     .
22             And that information was maintained in the
23     ordinary course by the Metropolitan Police Department;
24     is that right?
25             THE WITNESS:  Yes, sir.

1    THE COURT:  And where did it indicate the

2    call had been made from?

3    THE WITNESS:  From --

4    THE COURT:  What (unintelligible)?

5    THE WITNESS:  Seventeen --

6    THE COURT:  Where did it indicate the call

7    had been made?

8    THE WITNESS:  Made from 1700 Pennsylvania

9    Avenue.

10    THE COURT:  1700 Pennsylvania --

11    THE WITNESS:  Yes.

12    THE COURT:  -- in the northwest?

13    THE WITNESS:  In the northwest.

14    THE COURT:  Which is one block from the White

15    House?

16    THE WITNESS:  Yes, sir.

17    THE COURT:  So that indicated that the

18    subscriber was at the location?

19    THE WITNESS:  Yes, sir.

20    THE COURT:  How would the -- How were you

21    able to ascertain the name of the subscriber?  Was that

22    a different database?

23    THE WITNESS:  That was provided to us by

24    Metropolitan Police Department, as well.

25    THE COURT:  Thank you.

1   BY MR. MILES:

2   Q.   And my question is, and how did you learn the

3   address?  Was that from a different database?  That's

4   what I'm --

5   A.   Same information came from MPD, had the name and

6   the address.

7   Q.   And I guess what I'm trying -- Is that -- Was the

8   address tied to the telephone number or is the address

9   simply tied to name?  I guess that's the --

10          THE COURT:  Mr. Miles, let's go back and

11  start all over again.

12          You ascertained the location of the phone,

13  not from the database, but by checking the  signals

14  that are bouncing off the tower?

15          THE WITNESS:  Right.

16          THE COURT:  That's called "cell site location

17  information."

18          The Deputy has explained to us that MPD

19  maintains that.  I explained that under the FCC

20  regulations, when a 911 call is made, the regulations

21  require that the police be able to tell where the call

22  is been going -- coming from.  That's been true since

23  10/20/12, I believe.

24          Now, there is an independent source of

25  information apparently available to MPD, which tracks

1　-- which tells anyone who looks at it, the subscriber

2　of a phone.

3　　　　　That phone was the cell phone, right?

4　　　　　THE WITNESS: Yes, sir.

5　　　　　THE COURT: Because only -- Because the cell

6　phone emits the signals, which hits the tower.

7　　　　　THE WITNESS: Yes, sir.

8　　　　　THE COURT: So it therefore follows, you

9　learn the location from the cell site location, and the

10　subscription information from the provider?

11　　　　　THE WITNESS: Yes, sir.

12　　　　　THE COURT: Thank you.

13　BY MR. MILES:

14　Q.　And I understood all that, but where I'm still

15　confused is the subscriber information provided you

16　with the name of Mr. Williamson, but did it also

17　provide you with the Wisconsin address, not the

18　Pennsylvania address, that --

19　A.　Wisconsin address. Everything was provided to us

20　by MPD, so MPD 91 (phonetic) operator contacted and --

21　CTOC, and provided the information. We were notified,

22　and MPD subsequently provided the name of the

23　individual that was utilizing the cell phone, the name

24　it went back to, the cell tower location, and the

25　subscriber information that indicates 1041 Wisconsin

1    Avenue was provided to us by MPD.

2    Q.   Okay.  So what you're testifying to is as part of

3    the subscriber information, you learned about the 1041

4    Wisconsin address?  Is that what you're saying?

5    A.   Yes.

6              THE COURT:  Now, 1041 Wisconsin Avenue is --

7              THE WITNESS:  Northwest.

8              THE COURT:  -- is the address of the

9    Georgetown shelter?

10             THE WITNESS:  Yes, sir.

11             THE COURT:  So that's in -- What would be the

12   connecting street with 1041 Wisconsin?

13             THE WITNESS:  I'm not that familiar with

14   these --

15             THE COURT:  That's really close to the

16   Georgetown campus?

17             THE WITNESS:  Yes.

18             THE COURT:  So that would be 37th and L.

19             THE WITNESS:  L?  I mean, I go right down the

20   block as you -- that was the main street by the water

21   -- before the water --

22             THE COURT:  K Street?

23             THE WITNESS:  K Street, yes.

24             THE COURT:  That's where the shelter is?

25             THE WITNESS:  Yes, sir.

1           THE COURT:  And that's close --

2           THE DEFENDANT:  Excuse me, Judge?

3           THE COURT:  Yes?

4           THE DEFENDANT:  Georgetown Ministry isn't --

5           THE COURT:  Talked to Mr. Miles, Mr.

6    Williamson.

7        (Mr. Miles and the Defendant confer.)

8           MR. MILES:  Thank you, Your Honor.

9    BY MR. MILES:

10   Q.   So as I understand your direct testimony, you --

11   at some point there came a time when you wanted to

12   arrest Mr. Williamson; is that correct?

13   A.   Yes, sir.

14   Q.   And in doing so, you first went to the shelter, or

15   the address -- the residence on 1041 Wisconsin Avenue,

16   Northwest, Washington, D.C.?

17   A.   Yes, sir.

18   Q.   And what -- You spoke with somebody, as I

19   understand from your (unintelligible), and they told

20   you he was -- he just left?

21   A.   Yes.

22   Q.   Was that person an employee of the residence?

23   A.   I believe that person, yes.

24   Q.   The person was an employee?

25   A.   Yes.

1   Q.  And that person -- Did that person describe this

2   person that they were referring to, as Mr. Williamson

3   or just referred to him by name?

4   A.  An individual stated, "Jeffrey just left.  He had

5   a green shirt on" and a black -- (unintelligible)

6   "black bags."

7   Q.  Was this person shown a photograph of Mr.

8   Williamson?

9   A.  I believe my partner showed a photograph.

10   Q.  You're not sure but that's what you think?

11   A.  Yes.

12   Q.  And so you -- And you -- At some point you meet up

13   at Lafayette Park?

14   A.  Yes, sir.

15   Q.  And you saw Mr. Williamson there?

16   A.  Yes, sir.

17   Q.  And did I understand it, that you said -- Was he

18   handcuffed when you first saw him --

19   a.  Yes, he was handcuffed sitting there.

20   Q.  Do you know who put him in handcuffs?

21   A.  Special Agent Nick Fleming.

22   Q.  I see.  So it's just -- So that special agent got

23   to him before you saw Mr. Williamson?

24   A.  We are comprised of a squad.  We went to different

25   locations, went to the campus -- Georgetown shelter.

1      Special Agent Nick Fleming and other agents went
2    to Lafayette Park, 16 and H.
3    Q.   And by the time you got to Lafayette Park he was
4    already secured by other agents?
5    A.   Yes.
6    Q.   I see.
7         And he was seated --
8    A.   Yes, sir.
9    Q.   -- when you saw him?
10        And you said that you -- that he was -- somebody
11   had stood him up; is that correct?
12   A.   Yes, sir.
13   Q.   Law enforcement stood him up?
14   A.   Yes, sir.
15   Q.   And what exchange happened verbally?
16   A.   In order for us to transport an individual that's
17   arrested on the street corner, we need to do a search
18   for the individual -- for our safety, as well.  So
19   Special Agent Christie proceeded to do the search, pat
20   him down because in order for him to conduct a search
21   you have to get close to the individual.
22        Stood him up, started patting him down, started
23   searching him, and Special Agent John Dunham asked him,
24   "What do you want to be done with your property?  Do
25   you have family in the area?"  He said, "No, not close.

1   You guys put this information at FBI inventory, fuckin'
2   FBI inventory," so.
3       And Special Agent Jim Christie proceeded to do the
4   pat down, to do the search, and Mr. Williamson stated,
5   "Why don't you take the fucking cuffs off of me and
6   I'll gouge out your eyes and rip out your trachea."
7   And he said, "Why are you being so aggressive?"  He
8   said, "I eat guys like you for lunch," he stated within
9   close proximity.
10      Mr. Williamson was visibly agitated and started
11  talking about FBI been stalking him, yes.
12  Q.   And you were present?
13  A.   I was present.
14  Q.   And what were -- Did agents say words to him,
15  other than what you've testified?
16  A.   Also, Special Agent Christie said, "I've arrested
17  guys like you.  I've arrested guys like you."
18  Q.   And that's all he said?
19  A.   And, "I've been with guys like you," yes, to my
20  recollection.  Yes.
21  Q.   He didn't say more than that?
22  A.   To my recollection, that's what I remember.  Oh,
23  "Why are you so angry?", like to my recollection, yeah,
24  "Why are you so angry?  I've dealt with guys like you."
25  Q.   Did he say what he meant by, "Guys like you"?

1   A.    There were individuals that (unintelligible).  I
2   don't know what he meant by that.
3   Q.    Well, I didn't ask what he meant.  I just asked,
4   did he say anything --
5   A.    No.
6   Q.    -- other than -- what he meant?  Did he say
7   anything with regard to what he meant by, "Guys like
8   you"?
9   A.    No.
10  Q.    I want to ask you, you testified on direct that
11  one of the reasons you believe Mr. Williamson made the
12  call is because you recognized his voice.
13        Is that your testimony?
14  A.    Again, his voice is distinctive.  He starts by
15  name -- stating his name and mention his websites.
16  Q.    So --
17  A.    With all the calls that I've listened to, he's
18  been consistent with his websites.
19  Q.    Prior to this investigation you'd never had a
20  conversation with Mr. Williamson, right?
21  A.    No, sir.
22  Q.    You never heard his voice, right?
23  A.    No, sir.
24  Q.    So when you say you recognize his voice, you're
25  saying -- if I understand what you're saying, it's

1   because the caller states the name "Mr. Williamson" and
2   talks about his websites; is that right?
3   A.   Talks about his website and the assessment of some
4   calls, which is consistent with the calls that I
5   listened to.
6   Q.   On direct you also said during this arrest
7   situation that you thought that Mr. Williamson was
8   going to do a head butt or spit.
9        What made you think that?
10  A.   Because I've seen and done numerous arrests and
11  when an individual gets that close, the next logical
12  thing that I've seen in my law enforcement career, is
13  individuals (unintelligible) head butts the individual
14  doing close proximity.
15  Q.   Okay.
16       But he didn't spit, right?
17  A.   He did not.
18  Q.   And he didn't head butt?
19  A.   No, he did not.
20  Q.   And he didn't -- He didn't do anything other than
21  get -- being close, to suggest that he was going to do
22  either one of those things, right?
23  A.   He was squared -- With Special Agent Jim Christie
24  he was squared off.
25  Q.   All right.

1           But your statement about that's what you thought

2      he was going to do, you're basing that on prior

3      experiences?

4      A.    Yes.

5      Q.    What other people have done?

6      A.    Yes, sir.

7      Q.    But he didn't even start to lunge towards anyone

8      as if he was going to head --

9      A.    Squared.  He squared up.  He didn't lunge but he

10     squared up just with Special Agent Jim Christie.

11     Q.    By "squared up" you just mean he stood up

12     straight, correct?

13     A.    Yeah, stood up straight and looked him in the eye.

14     Q.    All right.

15                MR. MILES:  I have no further questions.

16                THE COURT:  Anything else, Mr.?

17                MR. YETTE:  (Inaudible.)

18                        REDIRECT EXAMINATION

19     BY MR. YETTE:

20     Q.    Deputy, did you speak to Mr. Williamson after his

21     arrest?

22     A.    Yes.

23     Q.    Did you hear his voice after --

24     A.    Yes.

25     Q.    -- he was arrested?

```
1   A.   Yes, sir.
2   Q.   And even during the arrest?
3   A.   Yes, sir.
4   Q.   And was that the same voice that you heard on the
5   911 call that you heard after his arrest?
6   A.   Yes, sir.
7   Q.   And when you say that Mr. Williamson squared up
8   with Agent Christie, was that to show that neither one
9   of them was afraid?  It was kind of a man-to-man --
10  A.   That's what I --
11  Q.   -- posture?
12  A.   Yes, sir.  I'd say that.
13            MR. YETTE:  I don't have any other questions,
14  Your Honor.
15            THE COURT:  Thank you, Mr. Yette.
16            Marshall, you can step down.  Thank you very
17  much.
18            THE WITNESS:  Thank you, sir.
19            THE COURT:  Any additional witnesses, sir?
20            MR. YETTE:  No, thank you.
21            THE COURT:  Do you rest?
22            MR. YETTE:  Yes.
23            THE COURT:  I find probable cause to believe
24  that the Defendant committed the crime with which he is
25  charged.
```

1    MR. MILES:   Your Honor, I do (inaudible).

2    One argument which is, I think, the least of

3 the strongest arguments, is that the Government -- I

4 would argue the Government is insufficient to prove

5 that Mr. Williamson is the person that made these

6 calls.

7    THE COURT:   Under Rule 901 of the Federal

8 Rules of Evidence, it is legitimate to rule on the

9 authenticity of the conversation by the finder of fact

10 based on his own comparison of the human voice and

11 hearing it.   I have now heard Mr. Williamson's voice on

12 the tape and I am convinced it's the same voice.

13    MR. MILES:   Second argument, Your Honor, is

14 that I would argue that the statements that they

15 attribute to Mr. Williamson do not constitute a threat

16 under Section 115(a)(1)(b) under Title 18, that the

17 Code doesn't specifically say this, but that there's

18 some case law that talks about that the threats have to

19 be serious threats or true threats, as distinguished

20 from idle or careless talk, exaggeration, or something

21 said in a joking manner, or political statements, or

22 statements that are simply intended to harass or annoy.

23    I think the critical point here is they have

24 -- there has to be a distinction between one's

25 constitutional right to freedom of speech on the one

1   hand, and something that is serious enough to be

2   criminalized, and I would submit that based on the

3   totality of the circumstances, that these alleged

4   statements cannot be considered true threats or serious

5   threats, and therefore, I would ask the Court not to

6   find probable cause and dismiss the Complaint.

7           THE COURT:  I disagree.  Relying on the

8   Supreme Court's decisions a distinction may be drawn

9   between political speech and direct threats to a human

10  being.  I find that, unequivocally, that the threat

11  articulated in the phone and the subsequent threat to

12  Coates, that he would gouge his eyes out and carry his

13  threat out to be not, under most circumstances, any

14  sort of political speech, and they certainly not were

15  idle threats.  I believe the Defendant was preparing to

16  follow through on them, if given the opportunity to do

17  so.

18          Accordingly, I find there is probable cause

19  to believe he committed the crime with which he is

20  charged.

21          Reference to his detention, I'll hear you,

22  Mr. Miles.

23          MR. MILES:  Your Honor, first of all, we

24  would submit that Mr. Williamson is not a danger to the

25  community.  While admittedly, I think the Government is

1   correct, he may be annoying and harassing, but he, we

2   would submit, is not a danger to the community, is not

3   -- there's no evidence in this case that he's actually

4   physically harmed anybody.

5           And when looking at his criminal history, his

6   criminal history also suggests -- I don't see any

7   conviction essentially for any crimes of violence, and

8   so that would indicate that he's not a danger to the

9   community.

10          I'll also note that there's no evidence that

11  he's been convicted for any weapons-related offense.

12          Secondly, we'd argue that Mr. Williamson is

13  not a flight risk.  He has not been convicted for

14  failure to appear, for escaping.

15          I note that he has --

16          THE COURT:  I thought he has been convicted

17  for failing to appear.

18          MR. MILES:  I believe there may be a -- I

19  don't believe it's a conviction, but I can check.

20          Court's indulgence.

21          THE COURT:  No, he was arrested.  We don't

22  know if he was convicted.  Go ahead.

23          MR. MILES:  That's what I recall.

24          So I don't see any convictions for failing to

25  appear or escaping.

1           The Pretrial Services Report indicates that

2     he has had cases in other jurisdictions, but he, you

3     know, sort of -- it appears that he shows up for court,

4     whether it be in Texas, Mississippi or California.

5           In his most recent case, which appears to be

6     the Texas case, he showed up.  He had a revocation

7     hearing later.  He showed up for that.  So he does show

8     up for court, even if he may not have the most stable

9     of residences.

10          And also, based on the testimony of the

11    officer, he did have a place to stay, which was at the

12    Georgetown Ministry shelter on 1041 Wisconsin Avenue,

13    Northwest, Washington, D.C., and that's -- he could go

14    back there.

15          And so for those reasons we do not believe he

16    is a danger to the community or a flight risk.

17          THE COURT:  Your client wishes to speak to

18    you, Mr. Miles.

19        (Mr. Miles and the Defendant confer.)

20          MR. MILES:  So we do believe that the Court

21    can fashion conditions of release.

22          Your Honor, alternative options are he could

23    be released with GPS monitoring if there's a concern

24    about his location.

25          He could be released to a halfway house, and

1    Mr. Williamson would be willing to agree to a condition

2    of his release, that he cannot make any phone calls to

3    designated places.  It can be to judges in a

4    courthouse, to assistant U.S. attorneys, whoever the

5    Court will designate, but he's willing to do that, and

6    that could be a condition of his release.

7              THE COURT:  Thank you.

8              The Government's motion will be granted for

9    the reasons to be specified in a detention memorandum.

10             Suffice it to say that considering the

11   factors identified in the Bail Reform Act, the case for

12   the Defendant's detention is a compelling one.

13             He's first charged with a dangerousness and

14   serious crime.  I cannot possibly dismiss these threats

15   as mere rum talk or, God help us, political speech.

16   They are threats of violence directed against a human

17   being, which are the result of some relationship

18   between Mr. Williamson and Agent Schmitt, which has

19   permitted Mr. Williamson to believe that Agent Schmidt

20   is the architect of all of his problems.

21             I find these threats to be directed at human

22   beings.  The threat to Coates is of the same ilk.  This

23   is dangerous, dangerous threats.

24             In terms of the strength of the Government's

25   case, it's overwhelming.  I've heard the voice on the

1   phone.  I've heard Mr. Williamson speak.  No doubt in
2   my mind it's the same human being.
3           There's subscription information taken from
4   (unintelligible) putting it right into his hand, so the
5   Government's case is very strong.
6           The Defendant's criminal record is
7   abominable.  He has many arrests and convictions for
8   various offenses.  They all seem to -- Several of them
9   seem to be of the same ilk, involving threatenings --
10  threats or trespassing, crimes against a person,
11  harassment, and so forth.
12          There is a lot of anger in Mr. Williamson, as
13  reflected by that criminal record.  I believe he truly
14  is dangerous.  I think he's dangerous not only to the
15  agents, but I think he's a dangerous, in general, to
16  our  community.  It is not too much of a stretch of the
17  imagination to see any danger to the President and to
18  the Attorney General, as well.
19          There's something terribly wrong with the way
20  this Defendant articulates his concerns with the
21  language -- the truculent language on violent behavior.
22  I therefore think he presents an extraordinary danger
23  to the community.
24          Weighed against that are no votes at all.  He
25  lives in a shelter.  From what I can tell, the past

1   several months he seems to have been in several

2   different states.  His criminal record takes place in

3   several different states.

4          There's nothing really here that gives me any

5   confidence whatsoever, that I can set conditions of

6   release that would reduce to a tolerable level, the

7   obvious danger he presents to this community and to its

8   members, particularly those members who are either high

9   positions of authority or in law enforcement.

10          The Government's motion is granted.  The

11   Defendant is held (inaudible).

12          MR. YETTE:  Your Honor, the Government

13   (inaudible) the agent was Agent Christie, not Coates,

14   that you referred to.

15          THE COURT:  What did I say?

16          MR. YETTE:  "Coates."

17          THE COURT:  I'm sorry.  Excuse me.

18          MR. YETTE:  That's all.

19          MR. MILES:  Your Honor, my client complains

20   of some medical issues he has that --

21          THE COURT:  Fill out the form.

22          MR. MILES:  All right.

23          THE COURT:  Thank you.

24          Remand the Defendant (inaudible).

25          (Proceedings concluded at 3:13 p.m.)

INDEX

|  | Direct | Cross | Redirect | Recross |  |
|---|---|---|---|---|---|
| WITNESSES FOR |  |  |  |  |  |
| THE PLAINTIFF: |  |  |  |  |  |
| Adewale |  |  |  |  |  |
| Mustapha | 2 | 19 | 56 | -- |  |

| EXHIBITS: |  |  |  | Offered | Admitted |
|---|---|---|---|---|---|
| P-1 | Affidavit and Complaint |  |  | 4 | 4 |

C E R T I F I C A T E

I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings

in the above-entitled matter.


/s/_____          October 26, 2014

STEPHEN C. BOWLES